2009 UT App 126

**Amber McKELVEY, individually and on behalf of Hamilton Brother's Electric, Inc., a Utah company, Plaintiffs and Appellants,**

v.

**Stuart G. HAMILTON and Vincent Hamilton, Defendants and Appellees.**

**No. 20080117–CA.**

Court of Appeals of Utah.

May 7, 2009.

Christopher R. Hogle and Richard D. Flint, Salt Lake City, for Appellants.

Mark O. Morris, Troy L. Booher, and Katherine Carreau, Salt Lake City, for Appellee.

Before Judges BENCH, ORME, and DAVIS.

## OPINION

BENCH, Judge:

¶ 1 Plaintiff Amber McKelvey appeals the district court's judgments entered in favor of her brothers, Defendants Stuart and Vincent Hamilton. McKelvey first claims that the district court erred in concluding that the Hamiltons were authorized by a 1994 probate order to receive a disproportionate share of the family business. Second, McKelvey claims that the district court erred in concluding that the parties entered into an enforceable partial settlement agreement, which resulted in the dismissal of all her remaining claims. Finally, McKelvey claims that the district court abused its discretion in denying both her motion to introduce evidence of fraud and motion to file a reply to include fraudulent procurement in her pleadings.

¶ 2 McKelvey's first claim fails because the district court correctly concluded that the probate order authorized the Hamiltons to receive remaining estate assets, including the

company stock, after all other distributions had been made. McKelvey's second claim fails because the district court correctly concluded that the parties entered into an enforceable partial settlement agreement. McKelvey's third claim fails because the district court did not abuse its discretion when it denied her belated motion to introduce evidence of fraud or to include fraudulent procurement in her pleadings. We affirm.

## BACKGROUND

*1990 Probate*

¶3 In 1990, Gordon Hamilton (Father) died, testate, leaving five children: Stuart Hamilton and Vincent Hamilton; Tonua Hamilton and Lisa Kunz (collectively, Sisters); and Amber McKelvey. Father's will was admitted to probate. His estate included 10,000 shares of Hamilton Brother's Electric, Inc. (the Company) stock, then valued at $84.10 per share, totaling $841,000. This dispute between McKelvey and the Hamiltons arises out of the distribution of the Company stock.

¶4 In 1994, the district court entered its Findings of Fact and Conclusions of Law and its Order Granting Interim Distribution (collectively, the Order), which was based on the Hamiltons' recommended plan for estate distribution and directed by Father's will. The Order confirmed that the Hamiltons were appointed as the estate's personal representatives and were granted the widest possible authority and discretion. Further, the Order provided that although the distribution of the estate among the siblings should be made as equal as possible, the division may require some negotiation because some of the siblings did not want an interest in the Company. Specifically, the Order recognized that McKelvey and Sisters had limited involvement with the Company, while the Hamiltons had been building and preserving the Company for over twenty years. The Order further recognized that the Hamiltons had indemnified McKelvey and Sisters from all future claims made against the estate by personally assuming all the estate's future debts and liabilities. Finally, the Order specifically stated that, after McKelvey and Sisters had each received their distributions from the estate, all remaining estate assets were to be equally divided between the Hamiltons.

¶5 In the Order, the estate's gross value was determined to be $1,957,242. After deducting $1,065,577 in expenses and reserves, the estate's net value was estimated to be $891,665. If divided equally among the siblings, each would receive $178,333. Instead, the Hamiltons proposed that McKelvey and Sisters could each have $195,000. After deducting $53,492 for distributions already made to each sibling, McKelvey and Sisters were to each receive $141,508. The Hamiltons would each receive a lesser sum of $99,840.

¶6 McKelvey chose to receive her distribution in the Company stock. She received 1683 shares, based on the value at that time of $84.10 per share. That same month, the Company issued a stock certificate to McKelvey. Sisters chose not to receive the Company stock and, instead, received cash payments.[1]

¶7 The Hamiltons received their $99,840 distribution in the Company stock, 1187 shares each. The Hamiltons were also allowed a $134,540 personal representative fee to be shared between them. They chose to receive this fee in the Company stock, giving them an additional 1600 shares. The remaining undistributed 4343 shares of the Company stock were issued to the Hamiltons a month later, apparently accounting for the remainder of Father's estate. Each brother ultimately received 4158.5 shares for a collective total of 8317 shares.

---

1. Sisters chose to receive their distributions in deferred cash payments. Sisters each received $37,500 immediately, leaving a remaining amount of $104,008 to be paid to each. The Hamiltons agreed to make annual payments to Sisters of $20,000 each, with a 6% interest rate. Sisters' distributions were to be funded by the sale of real property from the estate. However, in the event that no real property was sold during the year or the sum fell short, the Hamiltons were personally responsible for making the yearly payments. On at least one occasion, the Hamiltons paid Sisters out of pocket.

¶ 8 McKelvey's attorney at the time, Michael Deamer, signed the Order, approving it as to form. No amendment was sought and no appeal was taken.

*2004 Lawsuit*

¶ 9 Ten years after the final distribution of Father's estate, McKelvey filed her first complaint against the Hamiltons. McKelvey amended her original complaint several times. Among other claims, McKelvey sought a declaratory judgment to determine her percentage of ownership in the Company.[2] Less than a year after McKelvey filed her first complaint and repeatedly throughout this litigation, the Hamiltons asserted in their answers and counterclaims that the Order authorized how the Company stock was distributed. Over a year after the Hamiltons first asserted authorization as an affirmative defense, McKelvey, for the first time, asserted that the Order was the product of fraud. The district court granted partial summary judgment on McKelvey's declaratory relief claim in favor of the Hamiltons, ruling that the Hamiltons were authorized under the Order to receive a share of the estate's net value, a personal representative fee, as well as any remainder of the estate in the form of the Company stock.

¶ 10 After her declaratory relief claim had been resolved, McKelvey filed a motion in limine to introduce evidence of fraud or, alternatively, to file a reply to the Hamiltons' answer to include fraudulent procurement in her pleadings.[3] The district court rejected McKelvey's motion to introduce evidence of fraud, finding that hearing such evidence would constructively allow her to bring a new affirmative claim challenging issues that had already been resolved—specifically, the district court's determination that the stock distribution was authorized by the Order. Further, the district court also rejected McKelvey's motion to include fraudulent procurement in her pleadings, finding her request untimely and prejudicial.

¶ 11 Prior to filing her declaratory relief claim, McKelvey's attorney at that time, Benson Hathaway, spoke with the Hamiltons' attorney, Mark Morris, and proposed a possible partial settlement agreement: the parties would limit all their claims to McKelvey's declaratory relief claim, which would be included in her amended complaint, and the parties would share the cost of a valuation expert to conduct an appraisal of the Company. Shortly thereafter Morris responded to Hathaway by letter, in which he wrote:

> I would like to clarify the proposal you suggested to me.... [Y]ou indicated that you wanted to jointly agree on a business valuation expert who could render an opinion on the value of [the Company], the cost of which would be shared by our clients. You also indicated that you would be willing to limit the issues now before the court solely to the issue of what Ms. McKelvey's percentage ownership is.... As I indicated to you on the telephone, my clients agree to this proposal.

¶ 12 Hathaway responded by letter, writing, "I am following up on our conversation regarding an approach toward resolving ... the pending litigation." Hathaway's letter included information on valuation experts who could conduct an appraisal of the Company. Hathaway also wrote, "Please contact me ... so we can more formally set out the procedure toward resolution of the parties' dispute." This letter contained no additional terms, no language denying the existence of an agreement, and no language indicating that the terms as stated in Morris's letter were incomplete or flawed.

---

2. With her declaratory judgment claim, McKelvey sought to be declared a one-third owner of the Company. McKelvey asserted that the distribution of the Company stock, if divided equally among the siblings, would result in each receiving a one-fifth share. McKelvey argued that because Sisters chose to receive money instead of the Company stock, the remaining two-fifths should have been distributed among her and the Hamiltons, making them equal one-third owners.

3. Initially, McKelvey asserted fraud as an unpleaded rebuttal to the Hamiltons' affirmative defense of authorization. When McKelvey filed a motion to file a reply to include fraudulent procurement in her pleadings, she chose the unusual vehicle of a reply as a response to the Hamiltons' answer, which included their affirmative defense of authorization.

¶ 13 Morris and Hathaway promptly set a date to interview an appraiser.[4] Morris also sent Hathaway a memorialization of the partial settlement agreement, which was never signed. Thereafter, McKelvey filed her final amended complaint, which included the declaratory relief claim. Morris responded by letter to confirm that, pursuant to their agreement, the Hamiltons need not answer McKelvey's latest complaint. Although there is no written response from Hathaway in the record, the Hamiltons did not answer McKelvey's complaint until a year after the parties discussed entering into a partial settlement agreement, and only after McKelvey denied that the agreement existed.

¶ 14 After McKelvey denied that the parties had entered into an agreement, the Hamiltons moved to have the partial settlement agreement judicially enforced. The district court granted their motion, concluding that the parties agreed to (1) share the cost of a business valuation expert and (2) limit all the parties' claims to McKelvey's declaratory relief claim. The district court's enforcement of the partial settlement agreement resulted in the dismissal with prejudice of all McKelvey's remaining claims and all the Hamiltons' counterclaims.

¶ 15 When McKelvey moved to include fraudulent procurement in her pleadings, the district court was then considering whether the parties had entered into a partial settlement agreement and had already granted partial summary judgment in favor of the Hamiltons on McKelvey's declaratory relief claim. By the time the district court denied McKelvey's motion, it had already dismissed all her remaining claims by enforcing the parties' partial settlement agreement. All her claims having now been disposed of, McKelvey appeals.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 16 First, McKelvey argues that the district court erred in granting partial summary judgment in favor of the Hamiltons by concluding, as a matter of law, that the Order authorized the distribution of the Company stock. "A district court's decision to grant summary judgment is reviewed for correctness...." *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 14, 194 P.3d 956 (internal quotation marks omitted). A grant of summary judgment is appropriate if the case presents no genuine issue as to any material fact and may be decided as a matter of law. *See D & L Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989).

■ ¶ 17 Second, McKelvey argues that the district court erred in concluding, as a matter of law, that the parties entered into an enforceable partial settlement agreement and further abused its discretion by enforcing the agreement, which resulted in the dismissal of all her remaining claims. McKelvey also asserts that the district court erred by considering inadmissible hearsay evidence. The existence of a contract is a question of law, to be reviewed for correctness. *See John Deere Co. v. A & H Equip., Inc.*, 876 P.2d 880, 883 (Utah Ct.App.1994). A trial court's enforcement of a settlement agreement is reviewed for abuse of discretion. *See id.* A district court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion, unless it involves a legal question, which is reviewed for correctness. *See Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App 405, ¶ 11, 197 P.3d 659.

■ ¶ 18 Third, McKelvey argues that the district court abused its discretion when it denied her motion in limine to introduce evidence of fraud or, alternatively, to file a reply to include fraudulent procurement in her pleadings. Admission or exclusion of evidence is reviewed for abuse of discretion. *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 10, 94 P.3d 193. A district court's decision to permit a reply is reviewed for abuse of discretion. *See* Utah R. Civ P. 7(a) ("[T]he court *may* order a reply to an answer ...." (emphasis added)).

## ANALYSIS

### I. Partial Summary Judgment

■ ¶ 19 McKelvey urges this court to view the Order as ambiguous and to construe

---

4. Morris and Hathaway never interviewed an appraiser because, before the interview could take place, Hathaway withdrew and McKelvey retained her current counsel.

it against the prevailing, drafting parties-the Hamiltons. *See Culbertson v. Board of Cty. Comm'rs*, 2001 UT 108, ¶ 15, 44 P.3d 642 (ambiguous court orders are treated as other ambiguous legal documents where ambiguities are construed against the party that drafted the order). However, because McKelvey cannot point to any facial ambiguities in the Order, we treat it as an unambiguous instrument.

¶ 20 The Order unambiguously states that any remainder of the estate should go to the Hamiltons. Nothing in the Order indicates that the Hamiltons' shares of the Company stock should be limited to the value of their specific distributions from the estate. In fact, the Order explicitly indicates the opposite, granting the Hamiltons any and all remainder of the estate. The Order is equally clear that McKelvey's distribution should be limited to $141,508 in the Company stock–1683 shares.[5]

¶ 21 The Order's distribution scheme is not without logic. The Order clearly states that while Father wished to make the estate distributions as equal as possible among his children, he also recognized that some inequality may result due to McKelvey's and Sisters' limited involvement with the Company. Further, the Hamiltons indemnified McKelvey and Sisters by taking personal responsibility for any of the estate's future debts or liabilities, including the annual payments to Sisters.

¶ 22 Finally, McKelvey approved the Order in 1994. McKelvey's attorney signed the Order, approving it as to form. No amendment was sought; no appeal was taken. McKelvey did not take issue with the distribution of stock until ten years after the Order had been entered and the stock distributed.

¶ 23 Therefore, the district court correctly granted partial summary judgment in favor of the Hamiltons in concluding that the Or-

der authorized the distribution of the Company stock.

## II. Partial Settlement Agreement

¶ 24 McKelvey raises two issues regarding the district court's enforcement of the partial settlement agreement. First, McKelvey argues that the district court erred by considering inadmissible hearsay evidence. Second, McKelvey argues that the district court erred by concluding that the parties entered into an enforceable partial settlement agreement and further abused its discretion in enforcing the agreement and dismissing all her remaining claims.

### A. Admissibility of Evidence

¶ 25 McKelvey first argues that the district court erred by considering inadmissible hearsay evidence in determining whether McKelvey and the Hamiltons entered into an enforceable partial settlement agreement. " 'Hearsay' is a statement ... offered in evidence to prove the truth of the matter asserted." Utah R. Evid. 801(c). Hearsay is generally inadmissible. *See id.* R. 802. However, words with legal significance, such as words of contract, are considered verbal acts and are not hearsay. *See Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App 405, ¶ 18, 197 P.3d 659.

¶ 26 McKelvey argues that Morris's letter is inadmissible hearsay because proof of the existence of a contract is based entirely upon the letter's truth. McKelvey relies on *Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App 405, 197 P.3d 659, in support of her argument. In *Moss*, plaintiff testified that she negotiated a settlement agreement with defendants through a mediator, and the mediator told plaintiff that defendants accepted her offer. *See id.* ¶ 7. This court determined that the mediator's statements, offered by plaintiff, were inadmissible hear-

---

5. Contrary to what McKelvey asserted in her declaratory relief claim, the Order is clear that the net value of the estate, not the Company, should be divided as equally as possible among the five siblings. Nothing in the Order indicates that McKelvey is entitled to a total one-third share of the Company stock nor a one-third share of the remaining undistributed stock. The

Order is also without any indication that McKelvey should be an equal shareholder with her brothers. Rather, McKelvey's distribution was determined to be slightly more than a one-fifth share of the estate's net value. Thus, McKelvey was entitled only to as much of the Company stock as her distribution of the estate's net value was worth: $141,508 or 1683 shares.

say because a mediator does not constitute an agent for purposes of a party-opponent admission and the existence of the contract was "premised upon the truth of the mediator's statements." *Id.* ¶¶ 17–18. *Moss* can easily be distinguished from this case because, there, the mediator's inadmissible statements were the only proof of a verbal act of contract. Here, Morris's letter is clearly admissible because it is proof in itself of a verbal act of contract and is not inadmissible on any other grounds.

¶ 27 Because Morris's letter is a verbal act of contract, it is not hearsay and is admissible. Accordingly, the district court did not err in considering Morris's letter in determining whether the parties entered into an enforceable partial settlement agreement.

B. Existence of Enforceable Settlement Agreement

¶ 28 McKelvey next argues that the district court erred in determining that the parties entered into an enforceable partial settlement agreement and further abused its discretion in enforcing the agreement. The basic rules of contract formation are used to determine whether two parties have entered into an enforceable settlement agreement. *See Goodmansen v. Liberty Vending Sys., Inc.,* 866 P.2d 581, 584–85 (Utah Ct. App.1993). Contract formation requires two necessary elements: offer and acceptance. *See 1–800 Contacts, Inc. v. Weigner,* 2005 UT App 523, ¶ 2, 127 P.3d 1241. An offer is a " " "manifestation of willingness" " " to enter into an agreement, inviting another to accept. *Id.* (quoting *Engineering Assocs. v. Irving Place Assocs.,* 622 P.2d 784, 787 (Utah 1980)). "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Constr. v. City of St. George,* 898 P.2d 1372, 1376 (Utah 1995). "An acceptance must unconditionally assent to all material terms presented in the offer . . . or it is a rejection. . . ." *Id.* The conduct of both parties may also be considered in determining whether they entered into an agreement. *See Goodmansen,* 866 P.2d at 585.

¶ 29 Hathaway's and Morris's communications constitute an offer and acceptance resulting in the creation of an enforceable agreement between the two parties. Hathaway proposed a partial settlement agreement, the terms being (1) the parties would share the cost of a valuation expert and (2) the parties would limit all claims to McKelvey's declaratory relief claim. These statements indicated to Morris that Hathaway was willing to enter into an agreement on behalf of their respective clients. Further, these statements invited Morris to accept Hathaway's offer, evidenced by Morris's act of writing an acceptance letter wherein he restated the terms of the agreement and further wrote, "[M]y clients agree to this proposal." An acceptance of an offer could not be more clear.

¶ 30 Additionally, the parties' conduct indicates that both parties believed a settlement agreement had been reached. After receiving Morris's letter, Hathaway did not respond in a way indicating either that he did not intend his communication as an offer or that he disagreed with the terms as Morris stated them. Rather, Hathaway began to act in accordance with their agreement by recommending valuation experts. Hathaway and Morris also scheduled an interview with one of the experts, and Morris began memorializing the partial settlement agreement. Further, upon receiving McKelvey's amended complaint, which included the declaratory relief claim, Morris confirmed with Hathaway that the Hamiltons need not answer the complaint because all other claims would be dismissed pursuant to the agreement. The Hamiltons did not file an answer until a year later, when McKelvey—then represented by new counsel—denied the existence of the partial settlement agreement.

¶ 31 McKelvey further argues that even if the parties began negotiating a partial settlement agreement, she did not intend the agreement to be legally binding until it was in writing and signed. " 'It is a basic . . . principle of contract law that agreements are enforceable even though there is neither a written memorialization of that agreement nor the signatures of the parties. . . .' " *Id.* at 585 (quoting *Murray v.*

*State,* 737 P.2d 1000, 1001 (Utah 1987)). " '[I]f a written agreement is intended to memorialize an oral contract, a subsequent failure to execute the written document does not nullify the oral contract.' " *Id.* (quoting *Lawrence Constr. Co. v. Holmquist,* 642 P.2d 382, 384 (Utah 1982)). Therefore, "[i]t is of no legal consequence that the parties have not signed a settlement agreement." *Id.* at 584. However, " ' "[i]f an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract." ' " *1–800 Contacts,* 2005 UT App 523, ¶ 7, 127 P.3d 1241 (quoting *R.J. Daum Constr. Co. v. Child,* 122 Utah 194, 247 P.2d 817, 820 (1952)).

¶ 32 McKelvey argues that her intent to defer the legal obligations of the agreement was apparent in Hathaway's letter in which he wrote, "Please contact me . . . so we can more formally set out the procedure toward resolution of the parties' dispute." McKelvey cites *1–800 Contacts, Inc. v. Weigner,* 2005 UT App 523, 127 P.3d 1241, in support of her argument. *See id.* ¶ 6. This case is dissimilar to *1–800 Contacts* because, there, the defendant explicitly stated that the legal obligations under the proposed contract were deferred until the contract was in writing and signed. *See id.* In contrast, here, McKelvey merely proposed that the agreement should be set out "more formally," indicating a mere memorialization of the agreement rather than a deferment of legal obligations. Although apparent that the parties intended to execute a written and signed agreement, their "subsequent failure to execute [a] written document does not nullify the . . . contract." *See Goodmansen,* 866 P.2d at 585.

¶ 33 Given that (1) the letters between Morris and Hathaway indicate that an offer was made and accepted, (2) the parties thereafter acted on the terms of the agreement, and (3) the parties did not intend to defer their legal obligations until the execution of a written and signed agreement, the district court did not err in determining that the parties entered into an enforceable partial settlement agreement. Having found that the parties entered into an enforceable agreement, the district court did not abuse its discretion in enforcing the partial settlement agreement and dismissing all McKelvey's remaining claims.

### III. Motion to File a Reply

¶ 34 At the time McKelvey attempted to introduce evidence of fraud or, alternatively, to include fraudulent procurement in her pleadings, the district court had already considered McKelvey's allegation that the Order was the product of fraud and concluded that the Order authorized the distribution of the Company stock. Further, by the time the district court made its decision to deny McKelvey's motions, it had also already dismissed all her remaining claims in enforcing the partial settlement agreement. Thus, permitting McKelvey to introduce evidence of fraud would allow her to raise a new affirmative claim, disputing issues already resolved-specifically, the validity of the distribution of the Company stock.

¶ 35 McKelvey's request to file a reply to include fraudulent procurement in her pleadings was untimely, coming over thirteen years after the Order was entered, a year after she first argued that the Order was the product of fraud, and over two years after the Hamiltons first asserted authorization by the Order as an affirmative defense. *Cf. Kleinert v. Kimball Elevator Co.,* 854 P.2d 1025, 1028 (Utah Ct.App.1993) (when determining whether to grant a motion to amend, a court may consider (1) timeliness of the motion, (2) justification for delay, and (3) resulting prejudice to the responding party). Allowing McKelvey to include fraudulent procurement in her pleadings would effectively allow her to belatedly bring a new affirmative cause of action. It is quite apparent that McKelvey sought to include fraudulent procurement in her pleadings only as a final attempt to preserve her suit after her declaratory relief claim had been dismissed and in anticipation of her remaining claims being dismissed subject to judicial enforcement of the partial settlement agreement. Thus, allowing McKelvey to affirmatively assert fraudulent procurement at such a late stage in the proceeding would be prejudicial to the Hamiltons. *See id.*

¶ 36 The district court therefore did not abuse its discretion in excluding evidence of fraud and in denying McKelvey's motion to file a reply to include fraudulent procurement in her pleadings.

## CONCLUSION

¶ 37 The district court was correct in granting summary judgment to the Hamiltons upon concluding that the Order authorized the Hamiltons to receive a distribution of the estate's net value, a personal representative fee, and the remaining shares of the Company stock because the Order does not limit the amount of stock the Hamiltons could have received and explicitly provides that they should receive any remainder of the estate. The district court also correctly concluded that the letters between the parties' attorneys were admissible and that the parties entered into an enforceable partial settlement agreement. Thus, the district court was within its discretion in enforcing the partial settlement agreement. Finally, the district court acted within its discretion in denying McKelvey's request to introduce evidence of fraud or, alternatively, to file a reply to include fraudulent procurement in her pleadings because her request was untimely and prejudicial.

¶ 38 We therefore affirm.[6]

¶ 39 WE CONCUR: GREGORY K. ORME and JAMES Z. DAVIS, Judges.

---

**6.** We deny the Hamiltons' request for attorney fees on appeal pursuant to rule 33 of the Utah Rules of Appellate Procedure. *See* Utah R.App. P. 33.