2025 UT App 43

# THE UTAH COURT OF APPEALS

VICKI JO NELSON,
Appellee,
*v.*
JAMES Q. NELSON,
Appellant.

Opinion
No. 20230483-CA
Filed March 27, 2025

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 214905299

Douglas B. Thayer, David B. Nielson, and Jessica
Griffin Anderson, Attorneys for Appellant

Jonathan Good, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      James Q. Nelson appeals the district court's award of alimony to Vicki Jo Nelson. More specifically, he contests the court's subsidiary determination that certain funds he receives on a monthly basis from a business entity are considered income for alimony purposes. We conclude that the district court did not abuse its discretion in making this determination and considering these amounts when calculating the ensuing alimony award. We therefore affirm.

BACKGROUND

¶2　James and Vicki[1] had been married for over forty years when Vicki filed for divorce in 2021. The district court entered a Bifurcated Decree of Divorce in 2022, dissolving the marriage and reserving all remaining issues for trial. A trial was held in early 2023, and the district court thereafter entered its Findings of Facts and Conclusions of Law, as well as a Final Decree of Divorce. In these rulings, the court ordered James to pay alimony to Vicki in the amount of $2,285 per month. The issue raised in this appeal concerns the court's calculation of James's income for purposes of the alimony determination, and we therefore focus on the facts related to this calculation.

¶3　In 2006, James began the development of "a multi-action, multidirectional computer-controlled windshield wiper." At some point, James and Vicki's neighbor, Dr. Jerry Nelson (Dr. Nelson),[2] became interested in James's wiper project. Dr. Nelson has a dual doctorate in microbiology and immunology, and prior to his retirement, he ran his own successful laboratory service firm for thirty years. Together, James and Dr. Nelson formed Nelson and Nelson Enterprises, LLC (the Company) in 2008 to develop and eventually market the windshield wiper. For the next few years, James continued to pour his time and efforts into the development of the wiper—generally working "18 hours a day"—while he and Vicki lived off their savings. When that money ran out in 2011, James and Dr. Nelson agreed that James would begin to receive $2,000 each month from the Company so that he could afford to continue putting his time into the development of the windshield wiper. As the years passed, the

---

1. Because the parties share a surname, we refer to them by their given names, with no disrespect intended by the apparent informality.

2. Although he shares a surname with the parties, Dr. Nelson is not related to them.

monthly amounts James received from the Company increased, becoming as high as $8,000 per month. This money received from the Company was used to pay for essentially all of James and Vicki's expenses. By the time of trial, the total amount of money James had received from the Company was over $766,000.

¶4      The categorization of the monthly funds from the Company was a primary issue of contention between the parties during the court proceedings. James categorized these funds as loans and testified that he will "[a]bsolutely" have to pay them back "at some point out of proceeds of the sale or [his] share of the [C]ompany." He testified that the interest rate on the loans was "point five percent above prime," but he presented no documentation setting forth the terms of this purported loan agreement. According to James, Vicki knew that he was taking loans from the Company.

¶5      Dr. Nelson similarly testified at trial regarding the amounts given to James. Dr. Nelson stated that he had invested "money into the business to give to James as a loan so that he could develop the product and work." Dr. Nelson also explained that the amount of the monthly loans fluctuated some over time, depending on how the Company was doing, and he stated, "In the early days, . . . [w]e were starting to do really well and starting to sell product, and I encouraged [James] to take more money . . . because . . . he was not making as much as I thought he should for all of the work and effort he was putting in."

¶6      Nonetheless, Dr. Nelson maintained that the money given to James had "all been loans" and that he would still expect repayment even if "the business does not do well." He did, however, acknowledge that James "simply ha[d] no ability to repay [him] if the [C]ompany continues on the track that it's been." And when questioned regarding "the existence of a debt instrument," he simply responded, "James knows it's a loan, I know it's a loan."

¶7 The accountant for the Company also testified at trial regarding the amounts given to James. The accountant explained how the Company had treated the amounts given to James in its tax filings: initially, in the years 2011 to 2015, the amounts were categorized "as a distribution reducing [James's] equity account below zero," but after this treatment triggered an IRS audit of James and the assessment of a capital gains tax, the amounts were recategorized, from the 2016 taxes forward, "as a loan to [a] partner." The accountant also testified that his "understanding [was] that [Dr. Nelson] does not intend to forgive this loan," and the accountant recognized that if Dr. Nelson *did* forgive the loan, the forgiven amount "would be treated as a cash distribution to James, and would be taxed at a capital gains tax rate in the year of forgiveness."

¶8 When Vicki was asked during trial about the amounts James received from the Company, she testified that she did not "know what the agreement [was] between [James] and [Dr. Nelson]," that she had not "seen an agreement to repay" the amounts, and that she had not "heard [James] say that he needs to repay" them. She also testified that the money "was salary for the job [James] was doing creating the wiper" and that James told her as much. However, at one point during cross-examination, Vicki acknowledged that she had "also heard James discuss that he has to pay that money back . . . [u]nless [Dr. Nelson] died." And when pressed as to a statement she had made during her deposition that she "would not be surprised if the money was actually a loan," she responded, "I've not got any documents to see what's going to be paid back and what's not going to be paid back. Is James working for free? No, James is not working for free. . . . Why would James work for free?" She continued, "I was told it didn't have to be paid back, the money, the time he invested on his own to create the product was a wage, a salary, and was not going to be paid back."

¶9 The district court ultimately determined "that the funds given to [James] were not loans, but rather, salary or wages, pure

and simple." The court elaborated on the various reasons supporting its decision. First, the court recognized that the initial purpose of providing funds to James was "to prevent [him] from seeking income away from the business." The court also reasoned, as to James's motivation, "no reasonable person would ever agree to such an arrangement that they would be required to work 18 hours a day endlessly for years and not only not get paid but have to pay back whatever money was given to them to survive and meet their day-to-day needs under some arrangement that has never been defined or documented." And the court further noted, "[t]he total interest on these so-called loans could be something approaching a million dollars."

¶10    Next, the court found not credible "the testimony that Dr. Nelson may demand repayment and sue [James] for these amounts should this business go under," and the court concluded "that Dr. Nelson has no intention of ever demanding repayment or collecting these amounts." The court also highlighted that "Dr. Nelson is a sophisticated businessman" and reasoned, "The very notion that these amounts are considered as loans by anybody— let alone someone with [Dr. Nelson's] experience, intellect, and business acumen—with zero documentation is not credible." Additionally, the court observed that "[e]ven the most basic principles regarding contracts . . . would all seem to be violated by this purported agreement, again with no terms set forth." The court found, instead, that "calling these large sums of money 'loans' versus salary . . . feels more like a tax loophole or tax deferment procedure to avoid income or payroll taxes than anything else." Further, the court noted that Dr. Nelson's testimony at trial—that "[James] was not making as much as I thought he should for all of the work and effort he was putting in"—suggested that the funds were earnings.

¶11    In contrast, the court found credible Vicki's testimony "that she was never informed that these [funds] were, or might be, considered loans." The court determined that her testimony was part of the "substantial evidence refuting [James's] claims."

¶12 In sum, the district court found "that these are factually not loans and the partners did not, and do not, truly consider them to be loans," and that "the money transferred from the business account into [James's] personal account is in fact his wage or salary for his arduous and endless work in this endeavor." Based on these findings, the court determined that the monthly amounts are "available for [James] to pay alimony"—indeed, the court ruled that because the amounts are all untaxed, "the full amounts are available to [him] to both meet his needs and meet [Vicki's] unmet need." After considering the remainder of the required alimony factors, the court arrived at a final alimony award amount of $2,285 per month.

ISSUE AND STANDARD OF REVIEW

¶13 On appeal, James contests the district court's determination that the funds he receives from the Company are not loans but are income for purposes of calculating alimony. He asserts that our review of the district court's determination should be for correctness, citing case law establishing that "[t]he existence of a contract is a question of law," *McKelvey v. Hamilton*, 2009 UT App 126, ¶ 17, 211 P.3d 390. But the district court's task here was not to assess whether the alleged agreement constituted a binding contractual agreement. Instead, the court's task was to make the factual findings necessary for the alimony calculation, including findings regarding James's ability to pay.[3] *See generally* Utah Code

---

3. The district court's ruling regarding alimony additionally provided that even if James and Dr. Nelson *had* considered these funds from the Company to be loans, the funds would nonetheless not be loans under the relevant legal analyses because "virtually every factor weighs against finding these were loans." The court further concluded "as a matter of law that these were not loans even had the parties considered them as such, which they do not."

(continued…)

§ 81-4-502(1) (requiring a court to consider "the ability of the payor to provide support" as a "factor in determining alimony"). "We review all aspects of the trial court's alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion within the bounds and under the standards our supreme court has set and so long as the trial court has supported its decision with adequate findings and conclusions." *Miner v. Miner*, 2021 UT App 77, ¶ 11, 496 P.3d 242 (quotation simplified).

## ANALYSIS

¶14    James argues that the monthly amounts he receives from the Company are "loans as a matter of law" because "[t]he undisputed evidence at trial was that the parties consistently treated the funds as loans and recognized them as loans." While James seemingly recognizes the general rule that "it is the province of the trier of fact to assess the credibility of witnesses," he asserts that, here, the district court's credibility determinations were improper because "a finder of fact is not at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt." *Woodward v. LaFranca*, 2013 UT App 147, ¶ 7, 305 P.3d 181 (quotation simplified), *abrogated on other grounds by Zavala v. Zavala*, 2016 UT App 6, 366 P.3d 422; *see also Super Tire Market, Inc. v. Rollins*, 417 P.2d 132, 135 (Utah 1966) ("This is the basis for the right of review on appeal whereby a court or jury may be prevented from obdurately refusing to accept credible

---

James argues that these portions of the court's ruling "mischaracterized the applicable law." But because this part of the court's decision provided a secondary reason set forth by the court—stating that James's arguments would fail "even if" James and Dr. Nelson had intended the amounts to be loans—we need not address it in the face of our affirmance of the court's primary findings on the matter.

uncontradicted evidence without any rational basis for doing so.").

¶15 As an initial matter, we take issue with James's characterization of the evidence on this point as "undisputed."[4] Such a characterization entirely overlooks Vicki's testimony that she was told by James that the money "was salary for the job he was doing creating the wiper" and that she "was told it didn't have to be paid back." And while James highlights other statements by Vicki that seem to conflict somewhat with this testimony, such a conflict does not render Vicki's testimony a nullity and the evidence "undisputed." Instead, it remains "the province of the factfinder to resolve evidentiary conflicts." *Blackhawk Townhouses Owners Ass'n Inc. v. J.S.*, 2018 UT App 56, ¶ 33, 420 P.3d 128; *see also State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644 ("The existence of a conflict in the evidence does

---

4. In making his argument that it was "undisputed" that the funds James receives are loans, James challenges the admissibility of Vicki's expert's testimony regarding whether the IRS would likely consider these amounts to be income to James. But the district court clearly did not rely on this challenged testimony in arriving at its decision, stating, "[T]he Court declines to examine the details of the expert's analysis of the federal tax code and legal definitions of loans versus income." Thus, to the extent there was any error in the admission of this expert testimony, such error was harmless. *See Capozzoli v. Madden*, 2024 UT App 176, ¶ 33, 561 P.3d 727 ("Under well-accepted harmless error standards, we don't reverse rulings unless there is a reasonable likelihood that the error affected the outcome of the proceedings." (quotation simplified)); *see also Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 489 (Utah Ct. App. 1991) ("On appeal, the appellant has the burden of demonstrating an error was prejudicial—that there is a reasonable likelihood that the error affected the outcome of the proceedings." (quotation simplified)), *aff'd*, 862 P.2d 1342 (Utah 1993).

not render the totality of the evidence insufficient. It is the role of the factfinder to examine and resolve such conflicts."); *Clarke v. Clarke*, 2012 UT App 328, ¶ 28, 292 P.3d 76 ("It is within the province of the trial court, as the finder of fact, to resolve issues of credibility. In so doing, the trial court is free to believe one person's testimony over the testimony of multiple others." (quotation simplified)).

¶16   Next, even if Vicki's testimony had failed to raise a dispute regarding the characterization of the funds, the district court would still have been free to find the testimony of James and Dr. Nelson on the matter not credible. "Clearly, the fact-finder is in the best position to judge the credibility of witnesses and is free to disbelieve their testimony. Even where testimony is uncontroverted, a trial court is free to disregard such testimony if it finds the evidence self-serving and not credible." *Glauser Storage, LLC v. Smedley*, 2001 UT App 141, ¶ 24, 27 P.3d 565 (quotation simplified).

¶17   Although James is correct that the fact finder's credibility determinations are subject to certain limits, the cases on which he relies state that those limits are reached when "the trial court has not articulated a reasonable basis" for its rejection of testimony, *Woodward*, 2013 UT App 147, ¶ 10, or the court "refus[es] to accept credible uncontradicted evidence without any rational basis for doing so," *Super Tire Market, Inc.*, 417 P.2d at 135. *See also Woodward*, 2013 UT App 147, ¶ 7 ("We may reverse a trial court's credibility determination if its findings in support of that determination are clearly erroneous, that is, if they are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." (quotation simplified)). Such limits are far from being reached in the instant case.

¶18   The district court determined that the testimony of James and Dr. Nelson was not credible, and the court articulated numerous reasons supporting this determination: (1) that the

purpose of the money was "to prevent [James] from seeking income away from the business" and allow him to devote his whole efforts to developing the windshield wiper; (2) that it was unreasonable to conclude that James had agreed "to work 18 hours a day endlessly for years and not only not get paid but have to pay back whatever money was given to [him] to survive"; (3) that it was unreasonable to conclude that a "sophisticated businessman" like Dr. Nelson would loan such a significant amount of money "with zero documentation" and that it seemed more likely that the "loans" categorization was a "tax deferment procedure"; (4) that the trial testimony of Dr. Nelson suggested that the funds were earnings when he explained that increases in the amounts were made, in part, because James "was not making as much as [Dr. Nelson] thought he should"; and (5) that the alleged agreement, having "no terms set forth," would violate all "the most basic principles regarding contracts." Thus, the district court articulated numerous reasonable and rational bases for its rejection of James's and Dr. Nelson's testimony that the funds were loans that would ultimately need to be repaid. And, simply put, "we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them." *Barrani v. Barrani*, 2014 UT App 204, ¶ 6, 334 P.3d 994.

¶19　James additionally takes issue with the district court's "failure to consider the tax consequences" of the money he receives from the Company, and he points specifically to the court's finding that those amounts "are all untaxed and the full amounts are available to [him] to both meet his needs and meet [Vicki's] unmet need." Yet James concedes that because he has been treating these amounts as loans on his tax returns, he has "not paid income tax on those funds." He suggests, however, that the court's treatment of the funds as income for purposes of the alimony determination will mean that "there will be years of back income tax to pay," which will "decrease [his] ability to pay alimony." We are not convinced.

¶20    Nothing in the district court's alimony decision requires James to alter the way he categorizes these funds on his taxes, nor has James signaled any intention to do so. Furthermore, even were James to now recharacterize these amounts as income on his taxes going forward, he points to no evidence presented to the district court regarding precisely what those tax consequences would be. Thus, any future tax consequences to James as a result of a recategorization of these amounts are entirely speculative at this juncture. And "we do not generally expect courts to speculate about hypothetical future tax consequences." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 97, 507 P.3d 385 (quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022). Thus, the district court did not abuse its discretion in this regard either.[5]

CONCLUSION

¶21    The district court did not abuse its discretion in finding that the monthly amounts James receives from the Company are income for purposes of the alimony calculation. Nor did the court abuse its discretion in failing to consider hypothetical future tax consequences in its calculation of the resulting alimony award. Affirmed.

_____

5. Instead, if it does become the case that James recharacterizes these funds on his taxes and, as a result, incurs a tax liability that materially lessens his ability to pay alimony, he will be able to petition for a modification of alimony. *See* Utah Code § 81-4-504(1) ("The court has continuing jurisdiction to make substantive changes and new orders regarding alimony based on a substantial material change in circumstances not expressly stated in the divorce decree or in the findings that the court entered at the time of the divorce decree.").