Lynn PETERSON, Plaintiff
and Appellee,

v.

Russell PETERSON, Defendant
and Appellant.

No. 910029–CA.

Court of Appeals of Utah.

Oct. 15, 1991.

David S. Dolowitz and M. Joy Douglas, Salt Lake City, for defendant and appellant.

Mary C. Corporon, Salt Lake City, for plaintiff and appellee.

Before BILLINGS, GARFF and RUSSON, JJ.

## OPINION

GARFF, Judge:

Russell Peterson appeals from a decree of divorce challenging the court's order of restricted and supervised visitation, and the order requiring him to pay the costs incurred by appellee Lynn Peterson for a custody evaluation, a polygraph examination, expert witness fees, services fees, and copying charges.

### FACTS

We draw the facts primarily from the court's findings. Where elaboration is necessary, we draw the facts from the record consistent with the court's findings.

The parties were married December 14, 1985, and a daughter was born to them on July 8, 1986. Ms. Peterson moved out of the home in March 1988 because of Mr. Peterson's excessive drinking and his lack of interest in her and in their child.

Ms. Peterson filed for divorce on May 16, 1988 seeking custody of the parties' child. She was awarded temporary custody at a hearing held April 11, 1989. During the eleven months between the parties' separation and the temporary hearing, Mr. Peterson provided no support for the child and he made little effort to exercise visitation.

After Mr. Peterson was ordered to pay temporary child support, he sought to obtain custody. He engaged Stanley S. Adams to represent him. Mr. Peterson obtained a stipulation from Ms. Peterson's counsel that a custody evaluation be performed by Dr. AuDean Cowley, a sociologist, who was Adams's maternal aunt. The court ratified the stipulation. Mr. Peterson did not disclose the familial relationship between Dr. Cowley and Mr. Adams to Ms. Peterson, her attorney, or to the court.

The court became aware of this relationship sometime after the evaluation was completed and released.

In late 1989, Mr. Peterson made allegations that the child had been sexually abused by Ms. Peterson and by her then-boyfriend, David Shaw. Mr. Peterson took the child to see Dr. Gerald Allred, a pediatrician, and reported that the child had been abused. Dr. Allred alerted the Division of Protective Services.

The Division arranged for a shelter hearing in the juvenile court on December 18, 1989. Both Dr. Allred and Dr. Cowley appeared and recommended to the commissioner that temporary custody be placed with Mr. Peterson. The commissioner recommended that Mr. Peterson receive temporary custody pending further order of either the juvenile or district court and pending a court-ordered medical evaluation of the child at Primary Children's Medical Center.

Another juvenile court hearing was held in January 1990, wherein a judge vacated the commissioner's shelter order, found the juvenile court had no further jurisdiction, and restored the status of the parties as it existed prior to the shelter hearing, to wit, that Ms. Peterson would have temporary custody pursuant to the district court's order.

In response to Mr. Peterson's allegations of sexual abuse, the district court, at another temporary hearing held February 9, 1990, granted Mr. Peterson's motion for temporary custody and ordered that Ms. Peterson have supervised visitation. This order was based on Mr. Peterson's affidavit wherein he summarized the recommendations of Dr. Allred and Dr. Cowley. The court, now aware of Dr. Cowley's conflict, granted Ms. Peterson's motion for an independent custody evaluation by Dr. Barbara T. Liebroder, a licensed psychologist.

Beginning February 16, 1990, Mr. Peterson began taking the child to Teena Sorensen, a registered psychiatric nurse, for therapy sessions related to his allegations of sexual abuse. Ms. Sorensen made at

least seven tapes of these sessions. She prepared an affidavit which Mr. Peterson submitted to the court detailing her belief that the child had been sexually abused by Ms. Peterson and by Mr. Shaw and urging the court to restructure visitation so that Ms. Peterson's visits could be more closely monitored.

On May 11, 1990, Ms. Peterson filed a motion requesting that the trial court find Mr. Peterson in contempt for failure to allow visitation. The court found no contempt and ordered that Dr. Liebroder make recommendations for visitation.

By this time, Dr. Liebroder had begun her independent custody evaluation. Her report was later received into evidence. Dr. Liebroder conducted written and oral psychological examinations of the parties, interviewed them and observed them with the child. She saw the child on four separate occasions and administered a battery of tests to her. She also spoke with Mr. Shaw, a former baby sitter, a worker from the Division of Social Services, and with Ms. Sorensen. She reviewed written reports and tapes that Ms. Sorensen had prepared, a report from Dr. Palmer, and a report from Dr. Allred. She reviewed written materials supplied by Mr. Peterson and by his sister, Melanie Curtis, a letter written by Ms. Peterson, and a report by Dr. Cowley. Finally, she reviewed a report from Dr. David Raskin who, on Dr. Liebroder's recommendation, had administered polygraph examinations to Ms. Peterson and Mr. Shaw.

Dr. Liebroder found that Ms. Peterson had been the primary care provider for the child up to January 12, 1990, and that there was reasonable certainty that neither Ms. Peterson nor Mr. Shaw had abused the child. She also testified that the child was more strongly bonded to Ms. Peterson and that she was the better parent.

The court found that the custody evaluation and testimony of Dr. Liebroder and the testimony of Dr. Raskin were more believable than the evaluations, reports, and testimony of Dr. Cowley, Ms. Sorensen, and Dr. Allred. The court adopted Dr. Liebroder's recommendation regarding custody and visitation.

The court found that "a parent willing to subject his minor child to repeated physical examinations for child sexual abuse and repeated 'therapy' sessions for sex abuse which never occurred is practicing a form of severe child abuse." The court also found that Mr. Peterson, by "repeatedly coaching his daughter to make false reports of sexual abuse and repeatedly coaching her to denounce her mother, is abusing a child psychologically by causing her to have ill feelings about her mother."

The court granted custody to Ms. Peterson and ordered that Mr. Peterson have restricted, supervised visitation consisting of five hours every Sunday, to "be supervised by a responsible independent third party adult to insure that the minor child is not further coached or persuaded to have feelings against her mother."

The court also ordered Mr. Peterson to pay Ms. Peterson $10,260.75 for her expenses. This amount included $5,144.75 for the second custody evaluation, the polygraph examination, expert witness fees, service fees, and copying charges.

Mr. Peterson filed an appeal challenging the restricted visitation and challenging the $5,144.75 portion of the costs.

## VISITATION

Mr. Peterson argues that the court's findings were clearly erroneous because they did not reflect certain observations made by Dr. Liebroder. He also argues that the court abused its discretion in concluding that he should be allowed only five hours of supervised visitation per week because, in so ruling, the court acted to punish him and did not act in the best interest of the child.

■ We set aside findings of fact only when they are clearly erroneous. Utah R.Civ.P. 52(a); *Davis v. Davis*, 749 P.2d 647, 648 (Utah 1988); *Ashton v. Ashton*, 733 P.2d 147, 149–50 n. 1 (Utah 1987). In making that determination, we give "due regard" to the "opportunity of the trial court to judge the credibility of the wit-

nesses." Utah R.Civ.P. 52(a). A finding is clearly erroneous when, " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *State v. Walker,* 743 P.2d 191, 193 (Utah 1987) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In challenging findings, the appellant

> must marshal all evidence in favor of the facts as found by the trial court and then demonstrate that even viewing the evidence in a light most favorable to the court below, the evidence is insufficient to support the findings of fact. If the appellant fails to marshal the evidence, the appellate court assumes that the record supports the findings of the trial court and proceeds to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case.

*Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991) (citations omitted).

■ As to the ultimate conclusion of restricted visitation, we accord the trial court broad discretion. *Davis,* 749 P.2d at 648. "So long as that discretion is exercised within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award." *Davis,* 749 P.2d at 648 (citations omitted).

■ As to the confines of the legal standards set for visitation orders, those orders "must be based on the child's best interests. Courts must give priority to the welfare of the children over the desires of either parent in determining visitation rights." *Riche v. Riche,* 784 P.2d 465, 469 (Utah App.1989) (citing *Kallas v. Kallas,* 614 P.2d 641, 646 (Utah 1980)). Restrictions placed upon visitation must be based upon "all relevant evidence as to the children's present and future well-being." *Kallas,* 614 P.2d at 645. The findings must detail any special or unusual circumstances justifying restricted visitation.

*Carlson v. Carlson,* 584 P.2d 864, 866 (Utah 1978).

Essentially, Mr. Peterson argues that the findings of fact were clearly erroneous because they did not reflect the following observations made by Dr. Liebroder at trial: (1) She had reservations about both parents, although either could provide adequately for the child; (2) The child is attached to both parents; (3) It would not be possible to determine whether the child had been sexually abused or by whom; and (4) Mr. Peterson believed he was protecting the child by refusing visitation.

Mr. Peterson culls the record in general, and Dr. Liebroder's testimony in particular, for evidence supporting his position. However, he fails to marshal the evidence supporting the court's findings. Because he fails to marshal the evidence, we must assume that the record supports the court's findings. *Saunders,* 806 P.2d at 199. We therefore proceed to analyze the accuracy of the court's ultimate conclusion regarding restricted visitation.

■ In concluding that visitation should be restricted, the trial court relied primarily on Dr. Liebroder's recommendations. The court supported this conclusion with detailed findings as to Mr. Peterson's relationship with his daughter. Those findings include Mr. Peterson's cruel treatment of Ms. Peterson, his excessive use of alcohol, his lack of interest in the child during the marriage and during the separation, his lack of interest in visiting the child, his refusal to pay child support before being ordered to pay temporary child support, his participation in arranging for a custody evaluation by a sociologist who had an ethical conflict, his nondisclosure of the conflict, his coaching the child to make allegations of sexual abuse to her aunt, to Dr. Allred, to Dr. Palmer, to a law enforcement officer, and to Ms. Sorensen.

The court also supported its conclusions with detailed findings discrediting Mr. Peterson's allegations. Those findings related to Dr. Liebroder's report, and to Dr. Raskin's report of his polygraph examinations, each of which discredited Mr. Peterson's allegations.

As we mentioned earlier, we are required to accept the findings on their face and give broad discretion to the trial court as we review its ultimate conclusion of restricted visitation. *Davis*, 749 P.2d at 648; *Moody v. Moody*, 715 P.2d 507, 510 (Utah 1985). We conclude that the court acted within its discretion because the visitation order was fully supported by detailed findings which reflected the legal standards set forth by this state's appellate courts. *Davis*, 749 P.2d at 648 (citations omitted).

Specifically, the court adequately detailed the special and unusual circumstances wherein Mr. Peterson had coached the child to falsely allege that she had been sexually abused, and he was actively undermining the relationship between Ms. Peterson and the child. Because the visitation order was based on sufficient findings and considered the child's best interests, we affirm the order.[1]

## COSTS

Mr. Peterson appeals the judgment ordering him to pay $10,260.75 at 12% per annum. He claims that $5,144.75 of this amount was improperly charged because that amount represented nontaxable charges for the custody evaluation, the polygraph examination, expert witness fees, service fees, and copying charges.

Mr. Peterson relies on Utah Code Ann. § 21–5–4 (Supp.1991), which was interpreted by this court in *Morgan v. Morgan*, 795

P.2d 684, 686–87 (Utah App.1990). *Morgan*, in turn, relied primarily on a nondomestic case, *Frampton v. Wilson*, 605 P.2d 771 (Utah 1980), and on Utah R.Civ.P. 54(d)(1). *Frampton*, *Morgan*, Utah Code Ann. § 21–5–4, and Utah R.Civ.P. 54(d)(1) all deal with witness fees in civil cases. Both *Frampton* and *Morgan* define costs as "those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment." *Morgan*, 795 P.2d at 686 (quoting *Frampton*, 605 P.2d at 774.) Both cases hold that "[w]itness compensation in excess of the statutory schedule is generally inappropriate as a cost." *Morgan*, 795 P.2d at 687 (citing *Frampton*, 605 P.2d at 774.)[2]

*Morgan* and *Frampton* each rely on Utah Code Ann. § 21–5–4 and on Utah R.Civ.P. 54(d)(1) governing cost awards in civil litigation:[3]

> Except when express provision therefor is made either in a statute of this state or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs....

Crucial to any discussion involving costs in domestic cases is Utah Code Ann. § 30–3–3 (1989), which authorizes a court to order either party to a divorce to pay a sum of money to the other party to enable such "party to prosecute or defend the action." *See Maughan v. Maughan*, 770 P.2d 156, 162 (Utah App.1989) (analyzing Utah Code Ann. § 30–3–3 based on need and ability to

---

1. Our concern here is whether the visitation order was based upon "all relevant evidence as to the child[ ]'s present and *future* well-being." *Kallas*, 614 P.2d at 646 (emphasis added). Such restricted visitation may subsequently not prove to be in the child's best interest. If Mr. Peterson agrees to desist in his allegations and agrees to support the relationship between Ms. Peterson and her child, and in fact does so, the order may be inappropriate. Nevertheless, we affirm, noting that all orders of visitation are subject to modification. Utah Code Ann. § 30–3–5(3) (1989); Utah Code of Jud.Admin. R6–404.

2. *Morgan* also held it was an abuse of discretion to award costs for appraisal fees, accounting fees, copying, word processing, courier services, local travel, litigation support, a business meal, and a miscellaneous search in a divorce action. The court reasoned that, while these fees may

have been properly incurred in preparation for trial, they could ·not be considered a cost because they were not considered taxable under *Frampton* or Utah Code Ann. § 21–5–4. *Morgan*, 795 P.2d at 687 & n. 4 (citing *Frampton*, 605 P.2d at 774).

3. In *Kerr v. Kerr*, 610 P.2d 1380, 1384 (Utah 1980), the Utah Supreme Court held that an award of $1250 in expert witness fees was excessive in light of the *Frampton* holding that expert witness fees may not be taxed as costs over and above the statutory rate as per Utah Code Ann. § 21–5–4. It is not clear in *Kerr* whether the expert was an evaluator or whether the expert testified as to the property division, although the latter seems more likely in light of the complex nature of the property involved. More important to our discussion is the fact that *Kerr* does not discuss Utah Code Ann. § 30–3–3.

pay). The problem with Mr. Peterson's analysis is the fact that neither *Morgan* nor *Frampton* discusses this section.

■ Section 30–3–3 is worded so as to afford divorce litigants a broader award of reimbursement, if need be, for the expenses of litigation, than those reimbursements authorized in other civil cases. *Weiss v. Weiss,* 111 Utah 353, 179 P.2d 1005, 1009 (1947).[4] Section 30–3–3 differs from Utah R.Civ.P. 54(d)(1) in that fees and costs are awarded according to need and ability to pay and not according to who prevailed. *Id.*

In *Weiss,* the court relied on common law, which "recognized the pecuniary dependence of the wife on the husband and that when he or she sued for divorce the wife, whether plaintiff or defendant, would in most cases, be left without resources to prosecute or defend." *Id.* The *Weiss* court affirmed an award of temporary alimony, travel expenses, attorney fees and "other expenses," holding that the receiving party does not have to be totally destitute to receive costs from the other party. *Id.* at 1010. The *Weiss* court also held that the statute "contemplates such awards when in the sound discretion of the court the circumstances of the parties are such that in fairness to the wife she should be given financial assistance by her husband in her prosecution or defense of the divorce action, and for her support during its pendency." *Id.* 179 P.2d at 1010.[5]

Costs in divorce litigation are treated differently from other civil litigation because the costs of such litigation, whether taxable or nontaxable, will ordinarily be paid from the marital estate, which the court is equitably empowered to divide between the parties. Utah Code Ann. § 30–3–5 (Supp. 1991). More importantly, as in this case, many of the costs of divorce litigation relate directly to the best interest of the child because they pertain to custody evaluations and expert testimony that enables the court to determine issues regarding custody, visitation, and allegations of child sexual abuse.

■ We therefore hold that section 30–3–3 empowers a court to use its sound discretion to define costs as those reasonable amounts that are reasonably expended to prosecute or defend a divorce action. We also hold that Utah Code Ann. § 30–3–3 empowers a court to use its sound discretion in determining whether to award costs based on need and ability to pay.

■ In reviewing an award of costs, we use an abuse of discretion standard. *Morgan,* 795 P.2d at 686 (citing *Frampton,* 605 P.2d at 773–74). *See also Weiss,* 179 P.2d at 1009 (holding that the court has sound discretion to weigh circumstances of the parties and determine whether a spouse should give financial assistance to the other spouse to prosecute or defend a divorce action). Our task then is to determine whether the court was within its sound discretion in awarding the disputed costs, specifically, the custody evaluation, the polygraph examination, expert witness fees, service fees and copying charges.

■ Here, the court found that the additional evaluation, polygraph, and expert fees were necessary to ensure that the custody and visitation orders reflected the best interest of the child. The court also found that these costs were necessary because of Mr. Peterson's false allegations. In other words, the court reasonably concluded that these amounts, plus the service and copying charges, were reasonably expended by Ms. Peterson to prosecute the action and to defend against Mr. Peterson's false allegations of sexual abuse. Therefore, we conclude that the court was within its discretion in concluding that the costs of the action included the custody evaluation,

---

**4.** *Weiss* dealt with a predecessor of section 30–3–3. "The court may order either party to pay to the clerk a sum of money for the separate support and maintenance of the adverse party and the children, and to enable such party to prosecute or defend the action." Utah Code Ann. § 40–3–3 (1943).

**5.** This claim is borne out in the Utah Task Force on Gender and Justice, Report to the Utah Judicial Council 11–13 (1990), which found that the spouse with the greater access to family funds also had greater access to the judicial system to pursue child custody and visitation claims.

the polygraph examination, expert witness fees, service fees, and copying charges.

In light of the fact that the court knew the financial situation of both parties and made a reasoned judgment based on that information, we conclude that the court was within its sound discretion to award these costs to Ms. Peterson based on her need and on Mr. Peterson's ability to pay.

We therefore affirm the court's order regarding visitation and costs.

BILLINGS and RUSSON, JJ., concur.