2013 UT App 147

## THE UTAH COURT OF APPEALS

JAMES WOODWARD,
Petitioner and Appellant,
*v.*
JULIE LAFRANCA,
Respondent and Appellee.

Opinion
No. 20120545-CA
Filed June 13, 2013

Fourth District, Provo Department
The Honorable Steven L. Hansen
No. 064401496

Sara Pfrommer and John Murray, Attorneys for
Appellant
Brent D. Young and Dallas B. Young, Attorneys for
Appellee

JUDGE JAMES Z. DAVIS authored this Opinion, in which
JUDGES WILLIAM A. THORNE JR. and MICHELE M. CHRISTIANSEN
concurred.

DAVIS, Judge:

¶1     James Woodward (Father) challenges the trial court's denial
of his petition to modify the custody provisions of his and Julie
LaFranca's (Mother) divorce decree. We reverse and remand for
further proceedings.

BACKGROUND

¶2     Father filed for divorce from Mother in July 2006,
immediately before their son (Child) was born. Although Father

initially petitioned for custody, he was soon after deployed to Iraq and the divorce was put on hold. In November 2007, the parties entered into a Stipulation and Agreement regarding custody and visitation, wherein Mother was awarded sole physical custody of Child subject to Father's rights to parent time. The trial court accepted the stipulation and entered a decree of divorce on February 15, 2008.

¶3      Between 2008 and 2010, the parties had a number of disputes concerning visitation, which resulted in additional court proceedings. In August 2009, Mother began making reports to police, the Department of Child and Family Services (DCFS), and the United States Army (Father's employer), alleging that Child had been physically and sexually abused during Father's parent time. Such complaints continued through July 2010 and resulted in a number of forensic interviews and examinations of Child. In September 2009, Mother put Child in therapy for the purpose of addressing the alleged abuse. After several months in therapy, Mother requested a new therapist because "she was looking for someone that maybe [Child] would talk to and she didn't feel like she was getting what she needed out of [the first therapist]." The second therapist (the Therapist) saw Child between December 2009 and August 2010. All of Mother's abuse allegations were determined to be unfounded.

¶4      On July 28, 2010, Father filed a Petition to Modify Decree of Divorce, in which he requested that sole physical custody of Child be transferred to him. On November 8, 2010, a domestic commissioner (the Commissioner) found that Mother had severely abused Child by making repeated unsubstantiated abuse allegations to various agencies and subjecting Child to multiple unnecessary forensic interviews and examinations. The Commissioner determined that it was in Child's best interests for temporary custody to be granted to Father and appointed a special master (the Special Master) to monitor and manage the parties' case. *See generally* Utah R. Civ. P. 53. A custody evaluator (the Evaluator) was also engaged to evaluate the parties and make

recommendations regarding custody in accordance with rule 4-903 of the Utah Rules of Judicial Administration. *See generally* Utah R. Jud. Admin. 4-903.

¶5 Mother objected to the Commissioner's recommendations, and the matter came before the trial court in a four-day hearing in November and December 2011. The trial court heard testimony from, inter alios, Mother, Father, the Evaluator, the Therapist, and the Special Master. The Evaluator opined, based on his interviews of all relevant individuals, psychological evaluations of Father and Mother, and extensive review of myriad collateral materials, that the question of which parent's custody would serve Child's best interests was "not a 'close call'" and recommended that Father be granted sole legal and physical custody of Child. The Therapist and the Special Master also testified regarding their concerns about Mother regaining sole custody.[1] However, the trial court rejected the experts' testimonies and found that "the Commissioner's Recommendation and Order was not justified." (Emphasis omitted.) The trial court's Findings and Conclusions explained,

> The Court found [Mother]'s testimony sincere and credible. Her demeanor and all that demeanor encompasses lead the Court to this conclusion. Evidence at trial demonstrated that [Mother] desisted her allegations many months ago. She also indicated that she will "support the relationship between"

---

1. The Guardian ad Litem also took the position in the trial court that "Child's best interests would be served by granting the Father's petition to transfer custody to him." However, the Guardian ad Litem has informed this court that "although the Office of Guardian ad Litem disagrees with the trial court's decision," it would not support Father's appeal in light of the discretion granted trial courts in making credibility determinations and evaluating best interests, and because it does not consider it to be in the best interests of Child for this dispute to be prolonged.

[Father] and . . . Child—[Mother]'s support of . . . Child and [Father]'s relationship is demonstrated by her past facilitation of parent time with [Father] and willingness to support such an arrangement in the future.

The court determined that the experts' testimonies were either not credible or not persuasive and refused to employ the experts' conclusions in its analysis of the best interests factors. Accordingly, relying primarily on Mother's testimony, the trial court rejected the Commissioner's recommendation and denied Father's petition to modify custody.

## ISSUE AND STANDARDS OF REVIEW

¶6     Father argues that the trial court abused its discretion by declining to modify the custody provisions in the divorce decree, asserting that the factual findings underlying its decision—its credibility determinations in particular—were unsupported by the evidence. "The trial court's decision regarding custody will not be upset absent a showing of an abuse of discretion or manifest injustice." *Sukin v. Sukin*, 842 P.2d 922, 923 (Utah Ct. App. 1992) (citation and internal quotation marks omitted). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a).

## ANALYSIS

### I. Evaluation of the Expert Testimony

¶7     Father first challenges the trial court's determination that the Therapist and the Evaluator were not credible and that the Special Master's testimony was unpersuasive. "[A]lthough the trial court

[is] not bound to accept" an expert's recommendation, the court is expected to articulate "some reason for rejecting the recommendation." *Tuckey v. Tuckey*, 649 P.2d 88, 91 (Utah 1982) (remanding for additional findings where the trial court rejected, without explanation, the recommendations of the Department of Social Services); *accord Sukin*, 842 P.2d at 925–26 (remanding for additional findings where the trial court failed to explain its rejection of a custody evaluator's recommendation). In this case, even though the trial court articulated several reasons for rejecting the experts' testimonies, Father maintains that those reasons were unsupported by the evidence and insufficient to undermine the experts' credibility. "It is the province of the trier of fact to assess the credibility of witnesses, and we will not second-guess the trial court where there is a reasonable basis to support its findings." *Reed v. Reed*, 806 P.2d 1182, 1184 (Utah 1991). Nevertheless, a finder of fact "is [not] at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt." *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931). Thus, we may reverse a trial court's credibility determination if its findings in support of that determination are "clearly erroneous," that is, if they "are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987); *cf. State v. Krukowski*, 2004 UT 94, ¶¶ 23–24, 100 P.3d 1222 (ordering that, unless the court of appeals could affirm on alternative grounds, the case should be remanded for the trial court to reconsider a witness's credibility where the trial court's original credibility determination was premised on its erroneous view that the witness had failed to comply with a duty to disclose certain information to the magistrate).

A. Findings Regarding the Therapist's Credibility

¶8     The Therapist testified that she was concerned about the effect Mother's anxiety over Child's visits with Father might have on Child and on his relationship with Father. She also expressed

concern about Mother asking Child "a lot of questions . . . about being abused." The Therapist testified that Mother continually pressured her to ask Child about abuse he may have suffered while in Father's custody, and that she had to repeatedly inform Mother that it was not the Therapist's role to question Child in that way. According to the Therapist, on one occasion, immediately after having been told by the Therapist that Child should not be asked such questions, Mother began asking Child "specific questions about what had happened" and the Therapist had to ask her to return to the waiting room for the remainder of the session.[2] The Therapist testified that this issue had been addressed with Mother "numerous times," which she clarified meant approximately "eight or nine times" over the course of sixteen or seventeen therapy sessions. The Therapist also testified regarding an August 29, 2010 letter she had written at the parties' request prior to their hearing before the Commissioner, in which she stated that "[o]ver the last two months, [Mother's] fear appear[ed] to have heightened." When cross-examined about the fact that the Therapist had not had sessions with Child between June 15 and August 5 of that year, the Therapist clarified, "[F]rom the time that I had seen [Mother] before [in June], where things seemed to be getting a little better, that now I'm seeing her in August and it seemed to be much more intensified."

¶9 The trial court found it significant that, despite testifying that she had reiterated to Mother "eight or nine times" that the Therapist's role was not to ask Child direct questions about the alleged abuse, the Therapist only recorded two or three such instances in her therapy notes. It further determined that the Therapist could not have known whether Mother's anxiety had "'heightened'" over "'the last two months'" at the time she wrote the letter because she had not seen Mother during most of the two-month period referenced. Based on these observations, the trial

---

2. Mother denied that the Therapist ever asked her to leave the session, and the trial court resolved this dispute in Mother's favor.

court determined that the Therapist's testimony was not credible and "discount[ed] her testimony."

¶10　We agree with Father that the trial court has not articulated a reasonable basis to reject this testimony. Particularly in light of the Therapist's testimony that Mother's heightened fears were exhibited not by a gradual increase in anxiety, but by a marked difference between her behavior at the time of the June sessions and her behavior at the time of the August sessions, we do not think it reasonable for the trial court to have concluded that the Therapist was incapable of observing Mother's heightened fear as described in her letter. Furthermore, although the inconsistency between the Therapist's notes and her testimony regarding the number of times she reiterated her role to Mother might be sufficient to support the trial court's conclusion that the higher number was inaccurate, it does not definitively demonstrate the inaccuracy of the Therapist's assertion. And regardless of whether the Therapist had this discussion with Mother on three or eight occasions, the fact that it had to be reiterated multiple times is consistent with the Therapist's overall concern about the effect Mother's anxiety was having on Child. In any event, we do not consider this one inconsistency, on its own, to be a reasonable basis for questioning the Therapist's overall credibility.[3]

B. Findings Regarding the Evaluator's Credibility

¶11　The Evaluator determined Mother to be an intelligent, capable, and loving parent and explained that Mother had no "severe psychopathology . . . that would preclude her [from] . . .

---

3. This is not to say that the trial court could not legitimately question the Therapist's claim that she had spoken to Mother about the role of a therapist on eight or nine separate occasions. However, we do not consider such an inconsistency to necessarily compromise the credibility of the Therapist's entire testimony as the trial court concluded.

being the primary custodian." However, the Evaluator believed Mother had an unspecified personality disorder characterized by paranoia and inflexibility, which he believed would be detrimental to Child, and ultimately concluded that Father was more capable of promoting Child's best interests.

¶12     The Evaluator observed that Mother had a tendency to interpret ordinary developmental behaviors and circumstances—such as Child having bumps and bruises, experiencing nightmares, and wetting the bed—as indicative of abuse. One incident that was particularly troubling to the Evaluator and exemplified Mother's overinflation of events was that when Child told his Mother that his five-year-old brother (Father's son) had urinated on him when they were bathing together, Mother interpreted the incident as the brother sexually abusing Child and reported that the brother had ejaculated on Child. The Evaluator also observed that Mother's paranoia was evidenced by her belief that the Guardian ad Litem and the Evaluator "were either asking trick questions or stumping her on questions" when they interviewed her and by her frequently asking the police to conduct welfare checks on Child while he was visiting Father, "without there being any apparent grounds to do that."

¶13     The Evaluator was also concerned about the tone of the communications between Mother and Child during the time Child was living with Father following the Commissioner's temporary custody order. The Evaluator testified that on approximately a dozen occasions, Mother had informed Child that she was praying for him and had placed his name on temple prayer rolls, which the Evaluator interpreted as giving Child the impression that he was in danger at Father's home. He also testified that similar ideas were expressed in postcards Mother sent to Child, identifying one in particular that read, "Cannot wait until you are safely home with me," which the Evaluator believed implied that Child was not safe where he was.

¶14    The Evaluator testified that his psychological testing of Mother produced results consistent with what he had observed in her behavior. In particular, Mother scored in the 99th percentile on the "cold-heartedness scale," which measures "absence of deep feelings of guilt, empathy and loyalty, as well as a lack of enduring attachment to others[,] . . . reflect[ing] an absence of tender social emotions and a callous failure to sympathize with others' suffering." The Evaluator opined that having such a personality would permit Mother to more easily "demonize or mischaracterize other people who care about [Child]" and may make her more willing "to subject[ Child] to a physically intrusive and psychologically intrusive evaluation." Mother also had elevated test results relating to depression; "ideas of persecution," which the Evaluator defined as "suspiciousness" and "attributing wrongdoing without the degree of evidence that other people would consider appropriate to make that attribution"; and "inter-personal passivity," which impacts an individual's ability to appropriately deal with conflict.

¶15    The trial court found the Evaluator's testimony to be not credible based on its determination that his "testimony was successfully impeached at trial." First, the court observed that the Evaluator was successfully impeached when he "admitted that his testimony . . . that [Mother] had taken . . . Child to a police department or DCFS in October 2008 was, in fact, incorrect." However, the Evaluator was actually asked not about occasions when Mother had taken Child to a police department or DCFS, but about police or DCFS investigations that had occurred. An incident did in fact occur in October 2008, but it involved Mother taking Child for a medical examination in relation to an abuse allegation, which the medical professional indicated would be "refer[red] to DCFS." The Evaluator's reference to this incident was therefore a reasonable response to the question asked and demonstrates, if anything, a misunderstanding of the question rather than a credibility issue.

¶16    The trial court next pointed out that despite testifying that postcards sent to Child contained religious messages similar to those expressed in the phone calls, the Evaluator later acknowledged on cross-examination that the postcards did not actually contain religious messages. While this may have weakened the Evaluator's testimony regarding the communications, it is not inconsistent with the thrust of the Evaluator's testimony, which was that the postcards and the phone calls were concerning because regardless of whether the messages discussed prayer in particular or more generally referred to Child's safety, they tended to give Child the impression that he was not safe with Father. In any event, this minor inconsistency is certainly not sufficient to compromise the overall credibility of the Evaluator's report and testimony.

¶17    The trial court also took issue with the Evaluator's testimony that Mother's frequently changing jobs evidenced her inability to get along with others. However, the Evaluator's reference to Mother's employment was not the basis for his determination that she had difficulty getting along with others. Rather, his recommendation reveals that this determination was supported by Mother's history of "short term relationships, conflicts with former spouses[ and employers], and psychological test results," as well as the fact that she had gone through five attorneys in this case and that her counseling records indicated that she had become alienated from family members and had conflicts with her church leaders. The Evaluator acknowledged that "[w]hile none of these events are singularly dispositive of the hypothesized personality pattern, *taken together*, the evidence is compelling." (Emphasis added.) Likewise, the Evaluator's acknowledgment that Mother might have had some legitimate reasons to be suspicious of Father—one of the trial court's other justifications for finding the Evaluator's testimony not credible—did not undermine his conclusion, supported by psychological testing and corroborating observations, that Mother's paranoia was largely psychological in nature and the result of a personality disorder.

¶18    Finally, the trial court determined that the Evaluator's report and testimony were undermined by his heavy reliance on the findings of the Commissioner, the Special Master, and the Therapist, which the court determined to be either unpersuasive or not credible. It is unclear how the trial court reached the conclusion that the Evaluator had heavily relied on these experts. The Evaluator testified that he considered it his duty "to do [his] own evaluation" rather than "mimic what the Commissioner said" and that the other sources were more of "a springboard to get information." Indeed, the Evaluator "consulted a great deal of collateral material in reaching [his] opinion," and he testified that this case was "probably in the upper ten percent, easy, for the amount of materials that [he had] gone through." Thus, there does not appear to be a reasonable basis for the trial court's determination that the Evaluator's opinion "relied heavily" on the opinions of the other experts.

¶19    Essentially, the trial court emphasized minor inconsistencies from the Evaluator's two-day testimony—most of which were irrelevant or not actually inconsistent—to support a determination that the Evaluator's entire evaluation and professional conclusions were not credible. While it is the prerogative of the trial court to weigh the evidence and judge credibility, and while the trial court is not bound by the conclusions of a custody evaluator, we determine that the trial court exceeded its discretion by rejecting the Evaluator's entire testimony under the facts and circumstances of this case.[4]

---

4. Our opinion should not be interpreted as undercutting the trial court's ability to make legitimate credibility determinations or a proclamation that every word spoken by the Evaluator was inherently credible. Rather, we hold only that the trial court's decision to disregard the Evaluator's entire testimony and evaluation based upon a handful of rather minor inconsistencies was erroneous. On remand, in reevaluating the best interests

(continued...)

C. Weighing of the Special Master's Testimony[5]

¶20    Like the Evaluator, the Special Master testified regarding the communications between Mother and Child while Child was living with Father. She too expressed concern that Mother was overly fearful for Child and was projecting her fears onto Child with statements about praying for his safety. She also testified regarding Mother's unwillingness to comply with orders of the Special Master by talking to Child about the court case, not letting Child end the phone calls when he wanted to, undermining Father's disciplinary decisions, and harassing Father with unreasonable numbers of phone calls to Child.[6] Although the trial court did not take issue with the Special Master's credibility, finding her testimony to be "professional and dignified," it ultimately concluded that her testimony was "not persuasive" and not "sufficient to justify a change in the custody arrangement." Essentially, the trial court did not interpret the tenor of the phone

---

4. (...continued)
factors, the trial court is free to reject specific opinions or recommendations of the Evaluator, where it can articulate a reasonable basis for doing so, and to weigh the Evaluator's recommendations in the context of all the other evidence before the court.

5. Although both the Special Master and her assistant testified, their testimony covered essentially the same subject matter. Therefore, while our analysis applies equally to the court's evaluation of the assistant's testimony, we discuss only the trial court's evaluation of the Special Master's testimony for simplicity.

6. The trial court's decision does not refer to this testimony regarding Mother's noncompliance with the orders of the Special Master, but it seems to us that this testimony may have been unduly disregarded in the trial court's evaluation of Mother's willingness to facilitate visitation between Father and Child. *See infra* ¶¶ 31–33.

calls the way the Special Master and the Evaluator did and did not consider the calls to demonstrate inappropriate or overly fearful behavior on Mother's part. We do not think the trial court exceeded its discretion by interpreting the phone calls differently from the Special Master and considering them accordingly. However, we are concerned with the fact that the court dismissed the Special Master's concerns as a threshold matter without evaluating those concerns in the context of the best interests factors. While the content of the phone calls alone may not have been sufficient to justify a change in custody, it was relevant, in conjunction with the other evidence presented in this case, to the court's overall best interests determination and should have been analyzed accordingly.

## II. Best Interests

¶21    Father next contends that the trial court abused its discretion in determining that it was in Child's best interests for Mother to be awarded custody because its analysis of the best interests factors focused on whether "Mother is an acceptable parent" rather than whether "Mother is *more* acceptable than Father, in light of all the facts and circumstances of the case." We agree.

¶22    "[T]he best interests of the child must be a primary focus when analyzing a request for a permanent change of custody in an unlitigated decree." *Taylor v. Elison*, 2011 UT App 272, ¶ 10, 263 P.3d 448; *see also Elmer v. Elmer*, 776 P.2d 599, 603–04 (Utah 1989) (identifying "the overall best interests of the child" as the "ultimate objective" of the trial court in considering a petition to modify custody). A child's best interests must be determined "by a preponderance of the evidence," *see* Utah Code Ann. § 30-3-10.2(3) (LexisNexis 2007), based on a number of factors that compare "the parenting skills, character, and abilities of both parents in light of a realistic and objective appraisal of the needs of a child," *Elmer*, 776 P.2d at 603. *See generally* Utah Code Ann. § 30-3-10(1)(a) (LexisNexis Supp. 2012); *id.* § 30-3-10.2(2) (2007); Utah R. Jud. Admin. 4-903.

¶23    The best interests determination affords no special presumption in favor of the status quo except to the extent that "a child's interest in the stability of his or her present environment" may be considered as "one of numerous factors" impacting the child's best interests. *Hogge v. Hogge*, 649 P.2d 51, 55 (Utah 1982); *see also* Utah Code Ann. § 30-3-10.4(2)(c) (LexisNexis Supp. 2012) (directing courts to "give substantial weight to the existing . . . custody order when the child is thriving, happy, and well-adjusted"). Accordingly, a change in custody based on best interests does not require a determination that the custodial parent has been somehow derelict, but only that, weighing all of the circumstances, a change in custody will be "better" for the child.[7] *Hogge*, 649 P.2d at 55.

¶24    The Evaluator found the majority of the custody factors to weigh in favor of Father. He opined that the facts compellingly demonstrated that it was in Child's best interests that Father be granted sole physical and legal custody, stating, "[T]his recommendation is not a 'close call.'" Nevertheless, the trial court disagreed with the Evaluator and found that the majority of the factors weighed in Mother's favor. Its analysis of the best interests factors, on the whole, focused much more on Mother's ability as a parent than it did on the relative abilities of Mother and Father or on Child's needs. Furthermore, the trial court's disregard of the Evaluator's conclusions regarding these factors is explained only by its general assertion that the Evaluator's entire testimony was not credible, which we have determined to be erroneous. *See supra* ¶ 19 & note 4. On appeal, Father specifically challenges the trial court's assessment of factors relating to the parents' abusive behavior, the parents' emotional stability, Child's bond with his

---

7. This is tempered by the threshold material change of circumstances requirement, which prevents "'ping-pong' custody awards" once custody has been adjudicated. *Taylor v. Elison*, 2011 UT App 272, ¶ 13, 263 P.3d 448.

brother, the parents' bond with Child, and the parents' willingness to facilitate Child's relationship with the other parent.

A. Evidence of Abuse

¶25    The Commissioner found that Mother had abused Child by making multiple unfounded abuse allegations to the police and DCFS and by subjecting Child to unnecessary interviews and forensic examinations, and the Evaluator opined that "additional records . . . provide support for [the Commissioner's] finding." After examining the various abuse reports Mother made and the incidents where Child had been interviewed or examined, the trial court disagreed with the Commissioner's conclusions. On the whole, the trial court found that each report was a reasonable response either to something Child had told Mother or to physical evidence indicating abuse and that she was, in fact, legally obligated to report Child's disclosures of potential sexual abuse. It further found that the interviews and examinations were made in response to the recommendations of law enforcement and other professionals. Accordingly, the trial court determined that the preponderance of the evidence did not demonstrate that Mother's many unsubstantiated reports rose to the level of severe abuse.[8] *Cf. Peterson v. Peterson*, 818 P.2d 1305, 1308–09 (Utah Ct. App. 1991) (holding that coaching a child to falsely allege abuse may justify a change in custody). Although the evidence could certainly support the opposite conclusion, we do not think the trial court's findings relating to this factor were clearly erroneous.[9]

---

8. The trial court specifically found that Mother's actions did not amount to "severe abuse." It is unclear from this statement whether the trial court meant that Mother's actions did constitute abuse, but just not severe abuse, or whether it actually intended to find that Mother had not abused Child at all.

9. We do question the trial court's conclusion that "[t]his factor does not weigh in favor of [Father]." It is unclear whether the trial

(continued...)

B. Emotional Stability

¶26    The Evaluator found that Father was emotionally stable and on a positive trajectory in his life, whereas Mother battled depression and a personality disorder characterized by paranoia and difficulty maintaining personal relationships. The Therapist and the Special Master echoed the Evaluator's concern that Mother's paranoia had the potential to negatively impact Child.

¶27    The trial court found that Mother was emotionally stable as demonstrated by her abilities as a teacher, one longstanding friendship, and her efforts to provide Child with a steady daycare provider. The trial court made no findings regarding Father's emotional stability. Nevertheless, based solely on its determination that Mother was emotionally stable, it concluded that this factor "weigh[ed] heavily in favor of [Mother]."

¶28    As discussed, *supra* ¶¶ 22–24, the best interests factors examine the comparative abilities of the parents. Accordingly, the question for the court was not whether Mother was emotionally stable, but whether Mother was more emotionally stable than Father. Thus, we are unable to see how the trial court could have reached the conclusion that the emotional stability factor weighed in Mother's favor without making any findings regarding Father's emotional stability. We are also concerned, in light of our discussion of the experts' credibility, *see supra* ¶¶ 8–20, with the

---

9. (...continued)

court meant by this that the abuse factor weighed against Father or that it did not weigh in favor of either party. The trial court made no findings and there was no evidence suggesting that Father had abused Child. Thus, at most, the trial court could have found that this factor did not preponderate in favor of either party. However, if the court believed Mother had abused Child, just not severely, *see supra* note 8, then this factor would actually preponderate in favor of Father. In considering the totality of the factors on remand, the trial court should weigh this factor accordingly.

trial court's complete disregard of the Evaluator's clinical findings regarding Mother's depression and personality disorder, as well as its failure to take into account the Therapist's and the Special Master's testimonies in analyzing this factor.

C. Child's Bond with His Brother

¶29    Father next asserts that the trial court failed to afford Child's bond with his brother appropriate weight. The trial court determined that this relationship did "not carry significant weight with the court" because Child had only lived with his brother for approximately fifteen months during the temporary period when Father was granted custody by the Commissioner's order. Although it is the trial court's prerogative to weigh the best interests factors, it is not clear why the amount of time Child lived with his brother is determinative of their bond—and even if it were, fifteen months in the life of a five-year-old child is a significant period of time. The Evaluator opined that Child was strongly bonded to his brother and that his brother was a positive influence on him. His report also discussed clinical evidence regarding the importance of the bond between siblings, particularly those who are close in age. The trial court did not explain its reasons for rejecting the Evaluator's opinion on this matter.

D. Child's Bond with His Parents

¶30    The trial court determined that Child was more bonded to Mother than to Father because he had been raised primarily by Mother during the early years of his life. However, as with the strength of Child's bond with his brother, we fail to see how Child's relative bond with each of his parents necessarily stems only from the amount of time he has spent with them. The Evaluator determined that Child "demonstrates strong bonds with all parenting figures" and found this factor to favor neither parent. Once again, the trial court failed to explain its reason for rejecting the Evaluator's opinion.

E. Interference with Visitation

¶31 The trial court did not consider the parents' relative willingness to facilitate contact and a positive relationship between the child and the other parent, despite it being a significant best interests factor identified by the Utah Code. *See* Utah Code Ann. § 30-3-10(1)(a)(ii) (LexisNexis Supp. 2012); *id.* § 30-3-10.2(2)(c) (2007). The court did consider the evidence of Mother's interference with visitation but did so in the context of a material change in circumstances analysis. *See generally Hudema v. Carpenter*, 1999 UT App 290, ¶ 22, 989 P.2d 491 (outlining the two-part inquiry trial courts engage in when considering a petition to modify custody). In that context, a parent's serious interference with visitation may constitute a material change of circumstances that would permit the court to engage in a best interests analysis and potentially modify the decree. *See Sigg v. Sigg*, 905 P.2d 908, 913–15 (Utah Ct. App. 1995).

¶32 However, when the trial court considers a petition to modify an unadjudicated divorce decree, like the one in this case, it is unnecessary for the trial court to make a threshold determination of material change in circumstances. *Elmer v. Elmer*, 776 P.2d 599, 603–04 (Utah 1989). The trial court acknowledged this in its order, yet it elected to analyze Mother's alleged interference with Father's visitation as though it were considering the existence of a material change in circumstances, ultimately determining that the "issues and disputes about visitation" in this case did "not rise in any regard to the standard" for finding a material change in circumstances. Because the court was considering a petition to modify an unadjudicated divorce decree and acknowledged that it was not required to find a material change in circumstances, the court's conclusion that Mother's interference was not a material change in circumstances is irrelevant.[10] However, to the extent this

_____

10. It is unclear to what extent the trial court's determination that

(continued...)

conclusion may have informed the trial court's ultimate best interests determination, we consider the court's conclusion to be erroneous because it placed an undue burden on Father to demonstrate Mother's severe interference with visitation rather than weighing the parents' relative ability to facilitate visitation.

¶33 Interference with visitation, in the context of a best interests analysis, may be relevant regardless of whether such interference is severe enough to demonstrate a material change in circumstances. In weighing best interests, the trial court is directed to consider "which parent is *most likely* to act in the best interest of the child, including allowing the child frequent and continuing contact with the noncustodial parent," Utah Code Ann. § 30-3-10(1)(a)(ii) (emphasis added), and each parent's ability to "encourag[e] and accept[] a positive relationship between the child and the other parent, including the sharing of love, affection, and contact between the child and the other parent," *id.* § 30-3-10.2(2)(c) (2007); *see also id.* § 30-3-10(1)(a)(iv) (Supp. 2012). Thus, unlike the material change in circumstances analysis, which places the burden on the petitioning parent to demonstrate severe interference, the best interests analysis puts both parents on an equal footing before weighing their relative willingness and ability to facilitate visitation. In order to determine that this factor weighs in favor of

---

10. (...continued)
Father "failed to prove by a preponderance of the evidence that a 'substantial and material' change of circumstances between [M]other and [C]hild has occurred" affected its ultimate decision to deny Father's petition to modify. However, given that Father had no burden to show a material change of circumstances when petitioning to modify the custody provisions of an unadjudicated divorce decree, *see Elmer v. Elmer*, 776 P.2d 599, 603–04 (Utah 1989), the trial court's determination that a material change of circumstances had not occurred should not have had any impact on its ultimate ruling on the petition to modify, except to the extent that factual findings relevant to a material change of circumstances analysis were also relevant to the best interests analysis.

granting custody to one parent under a best interests analysis, the trial court need only determine that the parent is at least marginally more likely to encourage and support the other parent's relationship with the child. The court does not appear to have considered facilitation of visitation in the best interests context, despite having been presented with significant evidence relating to this factor. Instead, it dismissed Father's argument that he was more likely to facilitate visitation solely on its determination that Father failed to show severe interference by Mother of the degree necessary to show a material change in circumstances.

CONCLUSION

¶34 To the extent that the trial court's determinations regarding the best interests factors were premised on its erroneous determinations regarding the experts' credibility, they should be reexamined on remand to take into account evidence that was discounted on that basis. Furthermore, the persuasiveness of the experts' testimonies should not be considered in isolation, but in the context of the other experts' observations and opinions, as well as any other evidence bearing on the best interests factors. Finally, in weighing the best interests factors, the trial court must consider the parties' relative strengths so as to base its best interests determination not on Mother's ability as a parent, but on the parties' relative ability to serve the best interests of the Child. In analyzing the evidence relating to each of these factors, the trial court should specifically explain its reasons for rejecting relevant expert testimony regarding those factors.[11] Accordingly, we reverse

---

11. In analyzing the issues in this case, we acknowledge that the standard of review afforded to a trial court's factual and credibility determinations is highly deferential. With this standard in mind, we have taken great care in this opinion not to substitute our judgment for that of the trial court by reweighing the evidence. *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Accordingly, we have

(continued...)

and remand for additional proceedings consistent with this opinion.

————

11. (...continued)
rejected the trial court's determinations only where they are unsupported by the evidence or by sufficient findings. To the extent that we take issue with the trial court's weighing of expert testimony, it is primarily the trial court's failure to adequately explain its rejection of the testimony, rather than the rejection of that testimony itself, that we find erroneous. So long as the trial court can articulate a reasonable basis for rejecting specific expert testimony, the ultimate weight afforded to that testimony is within the trial court's discretion.